## Chicago G. W. Ry. Co. v. People ex rel., etc.

1. MANDAMUS—*Pleading in.*—The pleadings in mandamus are as at common law.

2. PRACTICE—*Omitting the Similiter in Mandamus.*—Where a similiter is omitted and the case proceeds to trial, it is to be treated as if formal issues had been joined and similiters filed or waived, according to the general rule in actions at law.

3. RAILROADS— *Right of Way—Accepting Benefits Must Bear the Burdens.*—A railroad company accepting the benefits and privileges of an ordinance granting it the right of way through an incorporated city becomes also subject to the burdens imposed by such ordinance.

4. SAME—*Mandamus the Proper Remedy to Compel a Railroad to do its Duty.*—Where it becomes the duty of a railroad company to build a bridge over a street and it refuses, mandamus is the proper remedy to compel the performance of its duty.

5. CORPORATIONS—*Acts of, May be Shown by Implication.*—The acts and assent of a corporation, like those of individuals, may be shown and inferred from facts and circumstances.

**Mandamus.**—To compel a railroad company to construct a bridge. Appeal from the Circuit Court of Kane County; the Hon. HENRY B. WILLIS, Judge, presiding. Heard in this court at the May term, 1898. Affirmed. Opinion filed December 14, 1898.

HENRY A. GARDNER, attorney for appellant.

BOTSFORD, WAYNE & BOTSFORD, attorneys for appellee.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

The mayor of the city of St. Charles, acting by the direction of the city council, filed a petition in the court below for a mandamus to compel the Chicago Great Western Railway Company to construct a bridge or viaduct over its railway track at Third street in said city, in accordance with the plans and specifications which had been theretofore approved by the city council " or such other suitable, safe and convenient crossing as may meet the approval of the city council of said city, and that such further order may

be made in the premises as justice may require." Defend-
ant answered.    Petitioner demurred to the sixth paragraph
of the answer, and the demurrer was sustained.    Petitioner
filed a replication to the seventh paragraph of the answer;
defendant demurred thereto; the demurrer was overruled
and defendant filed a rejoinder.    A jury was waived, proofs
were heard, and a peremptory mandamus was awarded
requiring the construction of a bridge slightly different
from that described in the specifications attached to the
petition.    Defendant appeals from that judgment.

Defendant argues that the eighth paragraph of the answer
should have been treated as a demurrer to the entire peti-
tion, and sustained thereto; and also that the court erred in
overruling the demurrer to the replication to the seventh
paragraph of the answer.    The pleadings in mandamus are
at common law.    People v. Crabb, 156 Ill. 155.    The first
five paragraphs of the answer contained a specific admission
or denial of every paragraph of the petition.    Defendant
could not at the same time demur to the petition.    By fil-
ing a rejoinder defendant abandoned its cause of demurrer
to the replication.    Moreover no error is assigned upon the
rulings of the court upon the pleadings, and therefore the
record presents no question of pleading for our decision.

Defendant seems to assume the case was tried only upon
the rejoinder to the seventh paragraph of the answer.    We
do not so understand the record.    The petition was divided
into seven paragraphs.    The first five paragraphs of the
answer admitted the facts stated in the first and sixth para-
graphs of the petition, and part of those in the second, and
denied the remaining allegations of the second paragraph,
and the allegations of the third, fourth, fifth and seventh
paragraphs of the petition; that is, there was in the first
five paragraphs of the answer a specific denial of every alle-
gation of the petition except those which were admitted.
Perhaps replications in the nature of similiters should have
been filed to said denials (though the denials did not con-
clude by tendering an issue to the country as required by
the rules of common law pleading), but the parties went to

trial without a formal joinder of the issue by the filing of similiters, and went into proofs as to the truth of the averments of the petition so denied; and we think the case should be treated as if formal issues have been joined by said allegations and denials of fact, and as if similiters had been filed or waived, according to the general rule in actions at law. Nieman v. Wintker, 85 Ill. 468; Hefling v. Van Zandt, 162 Ill. 162. We therefore treat the case as tried upon the admissions of the answer and upon the issues raised by said denials, and also upon the rejoinder to the replication to the seventh paragraph of the answer. As the rulings of the court upon the pleadings are not questioned by assignments of error, we are of opinion that if it be true, as argued, that the replication contains matter which should have been stated in the petition, still the pleadings are good after verdict, if, taken as a whole, they are sufficient to support the judgment. Defendant asserts petitioner was bound to prove contracts on the precise dates stated in the replication. The record shows, though the abstract does not, that these dates are each laid under a *videlicit*, and, by well known rules of pleading, petitioner was not bound to prove the precise dates.

Petitioner offered in evidence the records of the proceedings of the city council relative to said bridge. Defendant made one general objection that they were not admissible to prove the issues, and not relevant or pertinent thereto. The court admitted them subject to the requirement that the petitioner show their pertinency or relevancy, and defendant excepted. The records we think competent to show the action of the city council. Some recitals therein were not competent proof of the facts recited. But no special objection was made to those parts of the record, and in those material particulars wherein a special objection to the recitals should have been sustained, if made, the facts were also proved by oral testimony. There was no other exception by defendant to any ruling upon the evidence. No propositions of law were submitted.

Was it the duty of the railway company to erect a bridge

over its tracks, and such a bridge as the court ordered? The proofs show defendant is the successor and assignee of the Minnesota & Northwestern Railroad Company. In August, 1886, an ordinance of said city was adopted, the first section of which granted to said railroad company, its successors and assigns, authority to construct, maintain and operate its road and tracks as then surveyed and located over, upon and across certain streets of said city, including Third street. Sections 2 and 4 of said ordinance were as follows:

" Sec. 2. The right granted in section 1 of this ordinance is upon this express condition, that the said railroad company, its successors and assigns, shall at all times keep and maintain in good repair, and at its own cost and expense, at all places where said road and track or tracks, switches or side tracks shall cross any of said streets mentioned in section 1 of this ordinance suitable, safe and sufficient crossings and bridges and approaches thereto, and so as to interfere in the least manner possible with the use of such streets by the public, which shall be done subject to the approval of said city council.

" Sec. 4. The constructing or operating of said road by said company, its successors or assigns, shall be taken and considered as an acceptance and adoption on its part of all the provisions of this ordinance and an agreement and undertaking with reference to the same."

The railroad was constructed across said street by virtue of the provisions of the ordinance. The railroad company having thus accepted the benefits and privileges of the ordinance became also subject to its burdens. 3 Elliott on Railroads, Sec. 1081. At the trial it was stipulated that a bridge over Third street was necessary for the purpose and convenience of the public travel, and that it was practical for such bridge to be constructed over the track of said company at its intersection with said street; that in August, 1886, it presented to the city council a plan for a wooden bridge for its approval, and the city council rejected it; that the city demanded that it construct a bridge in accordance with the plans for an iron bridge attached to the petition herein, and that it refused to do so, " or to construct any

C. G. W. Ry. Co. v. People.

other bridge over Third street." Under said ordinance and the facts so stipulated, it was the legal duty of the railroad company to build a bridge over Third street, and as it refused to build any bridge over that street mandamus is the proper remedy to compel the performance of the duty. No fault is found in the argument with the details prescribed for the bridge, if an iron bridge ought to be built, and the only question is whether the court properly ordered an iron bridge instead of a wooden one.

The proofs show that early in January, 1892, the city council began to insist upon a bridge across said street, and directed notice to the railway company to that effect, and legal proceedings if the company failed to act. Egan, president of the company, and Wing, its local agent and adviser, then visited the mayor, stated that the company desired to construct the bridge, but was in financial straits and could not then expend the money for that purpose; that it desired to put in an iron bridge, and that the president thought it would be able to do so the following August (which the witness said would be in 1893, but as this conversation was in January, 1892, it would have been August, 1892). Egan further stated that if the company was compelled to put in a bridge at once, for want of available funds to build an iron bridge it would have to put in a wooden one, which it desired not to do. The mayor replied, if the company desired the delay on that account he would be willing to grant the extension and would endeavor to have the council agree thereto. Not long thereafter, and during January, 1892, Wing, for the company, came before the city council and made a like statement, and asked the city council to extend the time for building a bridge over Third street till after the annual meeting in July, 1892, when the company would erect an iron bridge over its road on that street. The council unanimously voted to give the time asked, provided the road would guarantee the council at its regular February meeting that said iron bridge should be constructed immediately after said July meeting. No such guarantee was given, but the council took no further steps

till July, except to endeavor to arrange a meeting between
the mayor and the president of the railway. A motion
made in March, 1892, to direct the city attorney to proceed
against the railway was defeated. The authority of the
president and Wing to act for the railway is not questioned.
By this transaction the railway in effect conceded it was
bound to put in a bridge as the council required, and prom-
ised to put in an iron bridge if given a delay till July. It
obtained the delay it asked, not by the direct vote of the
council, but by its refraining from further action. The
delay was a sufficient consideration for the promise to
build an iron bridge. This proof shows an agreement in
1892 to build an iron bridge. On July 2, 1892, the council
directed the city attorney to take steps to cause the speedy
erection of said bridge, but no action was taken under said
order.

Financial stringency followed, and the council took no
further steps to compel the railway company to build a
bridge till the summer of 1896, when it caused another notice
to be given the company. The attorney for the railroad
company then appeared before the council on August 2,
1896, and presented plans for a wooden bridge as already
stated, and asked that the company be given till October to
build it. The council voted to give the company till October
to build a bridge, but that it would require an iron bridge and
would not accept a wooden one. Correspondence followed
between the officers of the city and of the railway company
concerning bridges over this and other streets, in which
the city insisted on iron bridges. On August 18, 1896,
replying to a letter demanding an iron bridge, the general
manager of the road wrote the mayor, saying it did not
seem to the officers of the railway company that the ordi-
nance called for any particular kind of bridges, so long as
they were safe and well adapted to the traffic over them,
but that they were not disposed to stand upon any legal
rights they had or thought they had; that their main
object was to be in harmony with the patrons of the road.
In this letter the general manager said he wrote " to ask

you to have the established grades indicated on either a map or profile of the proposed bridges, and to give us an idea of the necessary width of the roadway and width of the sidewalk usual in the St. Charles bridges, and the prescribed load per square feet on both roadway and sidewalk. I assume that the roadway may be contracted a certain amount on a bridge. It is usual in most of the cities through which we pass, if not in all. As soon as we secure the data required, viz., the established grades of the streets, the necessary width of the roadway and sidewalk or sidewalks, and the live load per square foot that sidewalk and roadway are to be subject to, we shall make plans for such bridges as shall appear to us best and most suitable, taking all the circumstances and conditions into consideration, and submit the same to you, or such officers as you may direct, for examination." We are of opinion the first part of this letter meant that the railway company proposed to waive any right it might have to erect a wooden bridge, and meant to comply with the council's requirement for an iron bridge.

On August 31, 1896, the mayor answered, excusing delay by his absence, and saying an engineer had been sent for, and the data required would be furnished soon, and that the Chicago Iron and Bridge Company, by direction of the council, was preparing plans and specifications for three iron bridges over the streets under which the railroad bed passed. On September 30th, the mayor sent to the general manager the data called for, both as to Third street and also as to Second and Fifth streets. On October 2, 1896, the general manager wrote the mayor as follows: "I have your favor of September 30th, giving requisite data for street bridges at St. Charles. The data is exactly what is required, and I thank you for the same. * * * On bridges it is usual to contract the roadway by eliminating the space used for the standing of vehicles along the curb. I would therefore request your authority to reduce the roadway to sixteen feet, or if eighteen feet is more desirable, then make the sidewalks five feet each. In anticipation of the data you were

to furnish us I have had plans prepared, and have received bids on the construction of the Third street bridge on the dimensions given, viz., eighteen feet roadway and five feet sidewalks on each side.   The foundations are of masonry, laid in cement, columns, guys, railings and bracings of iron, joists of timber, with three inches plank roadway.   Please advise if either sixteen or eighteen feet roadway will not be satisfactory."

The proof discloses without dispute that such a bridge as is described in the letter last quoted is an iron bridge.   This letter recognizes the authority of the city council in the matters referred to, and the obligation of the railway company to build an iron bridge as required by the city, and shows an intention to comply.   On October 5th this and other letters from the officers of the railway company were presented to the council, and it voted that the driveway on the bridge on Third street should be eighteen feet, with five foot walk on each side, thus granting the request of the railway company.   On October 8th, the mayor wrote the general manager, whom he by mistake addressed as president, advising him the council had granted his request. During October both the railway company and the city had plans prepared for an iron bridge over Third street.   These plans did not differ materially except that the city's plans called for iron joists and the railway company's for wooden ones.   A civil engineer testified that he thought a wooden bridge at that place might be made safe, suitable and convenient, but that the iron bridge indicated upon the city's plans (which were in evidence) would be a safe, suitable and convenient bridge, and as economical as any bridge that could be placed at that point that would be safe, suitable and convenient, and that it would be the cheapest in the end. This proof was not controverted by defendant.   The railway company did not offer in evidence its plans for a wooden bridge, nor give the court any opportunity to try the question whether a bridge built in accordance therewith would be safe, suitable and convenient.

The acts and assent of corporations, like those of individ-

uals, may be shown and inferred from facts and circumstances. (L., N. A. & C. Ry. Co. v. Carson, 151 Ill. 444.) The conduct and correspondence of the officers of the railway company proved herein was circumstantial evidence tending to show an agreement by the railway company, in 1896, to build an iron bridge of the dimensions so furnished and modified, and in the absence of any contradictory testimony the court might well find such a contract proved. Aside from any agreement to build an iron bridge, the necessity for a bridge of some kind having been conceded at the trial, and the duty of the railway company to build one being clear, the proofs justified the court in requiring an iron bridge. Under the proofs an iron bridge would be cheaper in the end than a wooden one. After the railway company had obtained a modification by the city council of its plans to build an iron bridge, and after all that had previously occurred on that subject, we think the railway company was estopped from denying its obligation to build an iron bridge complying with the modified requirements of the council. It has not shown it would be harmed by building such a bridge instead of a wooden one. In the only respect in which the plans of the railway company and of the city for an iron bridge over Third street materially differ, the judgment of the court below gave the railroad company the option to use wooden or iron joists.

On October 30, 1896, the president of the railway company addressed the mayor a lengthy letter containing vague general promises for some kind of a bridge at some future time, but plainly indicating the railway company would do nothing then. Under these circumstances we hold the court had power to determine what bridge should be built, so long as it directed such a bridge as the ordinance called for, and one that would answer the public needs and would be economical and just to the defendant. We think the proofs justify the requirement of an iron bridge, and as the details of the required bridge are not assailed in the argument we are not called upon to discuss them.

The judgment will be affirmed.